**SECOND DIVISION**
**BARNES, P. J.,**
**BOGGS and RICKMAN, JJ.**

**NOTICE: Motions for reconsideration must be physically received in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**September 15, 2016**

# In the Court of Appeals of Georgia

A16A1420. ESQUIBEL v. THE STATE.

RICKMAN, Judge.

Juan Bernardo Esquibel was tried by a jury and convicted of possession of a firearm by a convicted felon, reckless conduct, and making a false statement. On appeal, Esquibel contends that the evidence was insufficient to support his conviction of making a false statement beyond a reasonable doubt. For the following reasons, we affirm.

On appeal from a criminal conviction, we view the evidence in the light most favorable to support the jury's verdict, and the defendant no longer enjoys a presumption of innocence. We do not weigh the evidence or judge the credibility of the witnesses, but determine only whether the evidence authorized the jury to find the defendant guilty of the crimes beyond a reasonable doubt in accordance with the standard

set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

(Citation and punctuation omitted.) *Hall v. State*, 335 Ga. App. 895 (783 SE2d 400) (2016).

So viewed, the evidence showed that on the night of November 16, 2013, a woman was standing in the parking lot of a local shopping mall when she heard something that "sounded like fireworks." She turned around saw a young male running from a restaurant with a black handgun in his hand. She observed the male get into a white Volkswagon Jetta with a broken taillight. The male then drove past the restaurant and around to the front of a department store and fired off two more shots before driving away. A police officer with the Dalton Police Department responded to the scene and located four .380 caliber shell casings in front of the restaurant and another one in front of the department store.

A waitress who was working at the restaurant recalled serving Esquibel beer for several hours on the night of the shooting. Due to Esquibel's drinking, the waitress had concerns about him driving and offered to call him a taxi. Esquibel declined the waitress's offer and told her that he lived right across the street from the shopping mall.

2

At some point, the waitress heard gunshots coming from the parking lot of the restaurant. She heard two gunshots and then, a "couple of seconds later" another two gunshots. The waitress looked out the door and saw the back of a white Volkswagon driving away.

After being shown photographs by a law enforcement officer, the waitress identified Esquibel as the person she served in the restaurant the evening of the shooting. The waitress also identified Esquibel on a surveillance video taken from the restaurant. The woman who was in the parking lot at the time of the shooting was shown a still photograph of Esquibel taken from the surveillance video and she testified that the person in the photo was wearing clothing consistent with the clothing worn by the shooter.

The investigating detective who was assigned to work on the case, received a phone call from an anonymous source who told him where Esquibel likely lived and that Esquibel drove a white Volkswagon Jetta. The residence was located near the shopping mall and a records search of the address came back to Esquibel and his mother. At some point, the detective drove by the residence and saw a white Volkswagon Jetta. The vehicle was registered to Esquibel's sister.

3

After calling places where he believed Esquibel may have been employed, the detective received a telephone call from Esquibel who identified himself on the call. A few hours later, Esquibel came to the police department to meet with the detective. During that interview, Esquibel told the detective that he didn't have a car.

The investigator searched Esquibel's home pursuant to a search warrant and a holster was found in Esquibel's bedroom that was consistent with the use of a .380 pistol. A bullet was located in a drawer in Esquibel's mother's room. The bullet was of the same caliber as the casings recovered from the shopping mall parking lot. The vehicle registration for the white Volkswagon Jetta was located in Esquibel's bedroom. While executing the search warrant, Esquibel's brother told a lieutenant that earlier in the day Esquibel drove the Jetta to his apartment and then he drove Esquibel to the police department. Keys to the Jetta were located in Esquibel's brother's vehicle.

Esquibel's mother testified that "sometimes" Esquibel drove the Jetta and that he would lend the vehicle to his friends. Esquibel's sister testified that she agreed to sell the Jetta to Esquibel and that he began to drive the vehicle. Esquibel made a couple of payments to her for the Jetta.

After the Jetta, with a brake light that was "not functioning properly," was found at Esquibel's bother's apartment, it was searched pursuant to a search warrant. Inside the vehicle the following items were recovered bearing Esquibel's name: mail, a prescription bottle, a credit card, an insurance card, pay stubs, a medical form, and a receipt from a pawn shop. These items bore dates ranging from before and after the shooting.

Esquibel was tried by a jury and found guilty of possession of a firearm by a convicted felon, reckless conduct, and making a false statement. Esquibel timely filed a motion for new trial, which was denied. It is from this order that Esquibel now appeals.

Esquibel contends that the evidence was insufficient to support his conviction for making a false statement beyond a reasonable doubt. Specifically, Esquibel argues that the State failed to prove that his statement to the investigator that he did not "have" a car was literally false when it was made.

> A person who knowingly and willfully falsifies, conceals, or covers up by any trick, scheme, or device a material fact; makes a false, fictitious, or fraudulent statement or representation . . . knowing the same to contain any false, fictitious, or fraudulent statement or entry, in any matter within the jurisdiction of any department or agency of state government or of the government of any county, city, or other political

5

subdivision of this state shall, upon conviction thereof, be punished by a fine of not more than $1,000.00 or by imprisonment for not less than one nor more than five years, or both.

OCGA § 16-10-20. The indictment in this case charged Esquibel with "knowingly and willfully mak[ing] a false statement, to wit: that he does not have a car" to the Dalton Police Department.

Citing *Thornton v. State*, 301 Ga. App. 784, 791 (3) (a) (689 SE2d 361) (2009), Esquibel argues that when he told the investigator he did not "have" a car, the term "have" could be interpreted to mean to hold, possess, or own and, thus, the State failed to prove that his statement was literally false at the time he uttered it. However, in *Thornton*, the indictment alleged that the defendant made a false statement at trial when he referred to a vehicle as "his vehicle," while the evidence established only that the defendant referred to the vehicle as "my" or "mine." Id. This Court held that because "my" and "mine" are pronouns that can "be used to demonstrate *either* possession or ownership," the State failed to prove that the defendant "ever affirmatively stated that he owned the [vehicle]." Id. As noted by the trial court in its order denying Esquibel's motion for new trial, in this case, there is no dispute between the language in the indictment and the evidence presented at trial. The

6

indictment accused Esquibel of telling the investigator that he did not have a car, and the evidence at trial was that Esquibel told the investigator that he did not have a car.

Moreover, there was ample evidence for the jury to find that Esquibel possessed and held the Jetta before and after the shooting. His mother testified that he drove the Jetta and let friends borrow it. His sister testified that he drove the Jetta. His brother told a lieutenant that Esquibel drove the Jetta to his apartment prior to speaking with the investigator and that the Jetta was located at that apartment. As discussed *supra*, the Jetta contained multiple items that identified Esquibel, including documents with dates ranging from before and after the shooting. Furthermore, there was also evidence from which a jury could find that Esquibel owned the Jetta. Esquibel's sister testified that she had agreed to sell the Jetta to Esquibel, he had already made a couple payments for it, and the Jetta's vehicle registration was found in Esquibel's bedroom.

We conclude that the evidence was sufficient for a rational trier of fact to find Esquibel guilty beyond a reasonable doubt of making a false statement. See generally *Sneiderman v. State*, 336 Ga. App. 153, 157-158 (2) (784 SE2d 18) (2016), disapproved by on other grounds, *Quiller v. State*, ____ Ga. App. ____ (____ SE2d ____) (Case No. A16A0114, decided July 15, 2016); see also *Simpson v. State*, 327

7

Ga. App. 516, 518-519 (1) (759 SE2d 590) (2014); *Watkins v. State*, 191 Ga. App. 87, 89 (2) (381 SE2d 45) (1989).

*Judgment affirmed. Barnes, P. J., and Boggs, J., concur.*